## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1.  ERICA D.  MARTINEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 18-cv-86-TCK-JFJ |
| v. ) | |
| ) | |
| 1.  BOTTLING GROUP, LLC, ) | *Jury Trial Demanded* |
| a Foreign Limited Liability Company, ) | |
| ) | *Attorney Lien Claimed* |
| Defendant. ) | |

## COMPLAINT

**COMES NOW** Erica D. Martinez, Plaintiff in the above-entitled action, by and through her attorneys, David R. Keesling and Timothy S. Kittle, of the law firm, MCMURRAY ǁ KEESLING, and for her causes of action alleges as follows:

### JURISDICTION, VENUE, PARTIES

1. Jurisdiction in this matter is based upon the existence of a federal question under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4), pursuant to claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.

2. Venue is appropriate as all incidents alleged herein occurred within the Northern District of Oklahoma.

3. Plaintiff Erica D. Martinez, at all times relevant to the claims alleged herein, was and is a citizen of the State of Oklahoma and a resident of Tulsa County, Oklahoma.

4. Defendant Bottling Group, LLC, (hereinafter referred to as "Defendant" or "Pepsi") at all times relevant to the claims alleged herein, upon information and belief, was and is a foreign limited liability company, organized under Delaware law, operating in and under the laws of the State of Oklahoma.

5. Defendant Pepsi, at all times relevant to the claims alleged herein, was and is an employer affecting commerce with fifteen (15) or more employees as defined under 42 U.S.C. § 2000e(b).

6. Defendant Pepsi, at all times relevant to the claims alleged herein, owns /owned and operates a Pepsi Cola bottling plant located at 510 West Skelly Drive in the City of Tulsa, County of Tulsa, State of Oklahoma.

7. Due to the foregoing, this Court has jurisdiction over the parties and subject matter.

## STATEMENT OF THE FACTS

8. Plaintiff Erica D. Martinez incorporates paragraphs 1 through 7 herein as if fully set forth verbatim.

9. Plaintiff was, at all times relevant to allegations contained herein, an employee of Defendant Pepsi within the meaning of 42 U.S.C.A. § 2000e(f), working in the capacities of "Machine Operator" and "Fork Lift Operator."

10. Plaintiff is and was a member of a legally recognized protected class, i.e. female.

11. Plaintiff began her employment at the Pepsi plant in June 2014.

12. During the entirety of Plaintiff's employment with Pepsi, the make up of the Tulsa Pepsi plant workforce was predominantly male.

13. On or about October 2014, was nearly assaulted by a male co-worker by the name of Tyrone while on the job.

14. Another co-worker named Mitch intervened and prevented Tyrone's assault.

15. On or about May 2015, a male co-worker named Engelbert began directing unwanted sexual advances at Plaintiff.

16. Specifically, Engelbert verbalized his desire to engage in sexual conduct with Plaintiff on at least three separate occasions.

17. Plaintiff rebuffed each of Engelbert's unwanted advances, which apparently angered Engelbert.

18. Because of Engelbert's unwelcome and pervasive conduct, Plaintiff requested and received a transfer to the night shift on or about June 2015.

19. However, Engelbert followed Plaintiff to the night shift shortly thereafter.

20. Accordingly, Plaintiff made contact with the night shift supervisor, Harry Wilbanks, and informed him of the issues Plaintiff had encountered with Engelbert previously on the day shift.

21. Plaintiff requested of Wilbanks that she be cross-trained on other machines in order to avoid contact with Engelbert.

22. In spite of Plaintiff's efforts to avoid him, Engelbert contrived "reasons" to present himself in Plaintiff's work area, away from his own machine.

23. Due to the previous encounters with Engelbert, Plaintiff found these actions on Engelbert's part to be offensive, harassing and intimidating.

24. Consequently, Plaintiff reported Engelbert's latest actions to Harry Wilbanks, advising Wilbanks that she found Engelbert's attempts to be an unwanted, harassing presence in her work area disconcerting.

25. Specific acts on the part of Engelbert included sitting on a forklift to prevent Plaintiff from using it, as well as deliberately parking a forklift in a spot other than the one designated for it.

26. In response, Plaintiff approached the night shift lead, a male named Troy, to advise Troy of Engelbert's conduct, and to inquire if there was another forklift available for Plaintiff's use.

27. Troy dismissed Plaintiff's complaints, stating that Plaintiff was making an issue over "nothing."

28. Further, when Plaintiff subsequently made requests of Troy, over a hand held radio, to use the forklift, both Troy and Engelbert would transmit sarcastic comments over the radio in response.

29. Moreover, each time Plaintiff would approach and board the forklift, Engelbert would stand very close to the forklift and glare at Plaintiff, making Plaintiff very uncomfortable, given the history of interactions Plaintiff had with Engelbert.

30. Because of this constant harassment on the part of Engelbert, Plaintiff repeatedly asked to be transferred to a position away from Engelbert.

31. However, Plaintiff's requests were denied.

32. On or about July 2015, Engelbert provoked a verbal dispute with Plaintiff over the radio.

33. An irate and hostile Engelbert began yelling at Plaintiff.

34. Troy the lead interrupted the exchange and blamed Plaintiff for creating the disturbance.

35. Days later, Engelbert approached Plaintiff in a very hostile and aggressive manner.

36. Plaintiff responded by backing up and onto the machine she was operating, and demanded that Engelbert return to his own machine.

37. Engelbert had no legitimate reason to be in Plaintiff's work area.

38. Engelbert followed Plaintiff onto her machine and then to the middle of the warehouse.

39. Engelbert approached Plaintiff, biting his lip and raising a fist as if to punch Plaintiff.

40. Engelbert then began yelling into Plaintiff's face.

41. Plaintiff immediately went into the Logistics Office, told the lab tech what had transpired and that she needed to locate Troy the lead.

42. Plaintiff then informed Troy of what had just taken place with Engelbert.

43. However, Troy once again dismissed Plaintiff's complaint.

44. Troy suggested that Engelbert would not strike Plaintiff, and further, blamed Plaintiff for somehow inciting Enbelbert's anger, stating that Engelbert was provoked to anger by Plaintiff's job performance.

45. The night following the incident described immediately above, Plaintiff was approached by the night shift supervisor, Harry Wilbanks, who accused Plaintiff of cursing over the radio.

46. The accusation leveled at Plaintiff was based on information provided by Troy the lead, who was invested in defending Engelbert.

47. In response, Plaintiff fully informed Wilbanks of all that had transpired between her and Engelbert, including the unwanted sexual advances, Engelbert kicking a chair at Plaintiff in the break room, and Engelbert "shoulder checking" Plaintiff as she was exiting the break room.

48. Succinctly, Plaintiff described to a supervisor a litany of events through which she was subjected to a hostile work environment, based on her sex, by a male co-worker, Engelbert.

49. Plaintiff advised Wilbanks that she felt unsafe in her workplace due to Engelbert's conduct, as well as Troy's dismissive demeanor regarding Plaintiff's complaints.

50. Plaintiff again asked to be transferred.

51. The following night, Plaintiff observed Troy the lead, night shift supervisor Harry Wilbanks, and the Plant Manager, Andrew Shipley, talking amongst themselves in the Production Office.

52. After she observed the group separating, Plaintiff approached Harry Wilbanks and re-urged her request to be transferred.

53. Wilbanks told Plaintiff she would not be transferred.

54. However, days later, Engelbert was transferred back to the day shift.

55. Notwithstanding the transfer to another shift, Engelbert continued to engage in conduct designed to harass and intimidate Plaintiff.

56. Specifically, Engelbert would remain in the workplace long after his shift ended and would stare at Plaintiff.

57. Pursuant to advice she garnered from a co-worker (who counseled against going to Human Resources for fear of being discharged), Plaintiff directed a request to Plant Manager Andrew Shipley that she be transferred to the bottling portion of the facility.

58. Shipley stated that Plaintiff would be put on the schedule for the bottling plant, but warned Plaintiff that she would not like working in that department.

59. Plaintiff was never placed on the bottling plant schedule.

60. Engelbert continued to remain at the worksite after the end of his shift, staring at Plaintiff.

61. In April 2016, Engelbert was returned to the night shift and assigned to the machine next to Plaintiff's, notwithstanding her complaints to supervisors regarding Engelbert.

62. Further, Engelbert engaged in an altercation with Plaintiff's boyfriend, who would pick Plaintiff up after work.

63. After this event, Plaintiff spoke with Plant Manager Andrew Shipley about her Engelbert issues.

64. Shipley admonished Plaintiff for assuming that he had been informed about her problems with Engelbert.

65. Plaintiff explained she made the assumption due to the facts that she had repeatedly complained to her immediate supervisors, Troy the lead and Harry Wilbanks, and she had seen the three of them conversing, as described above.

66. Shipley ultimately stated that an investigation into Plaintiff's complaints would be initiated.

67. Subsequent to her meeting with Andrew Shipley, Plaintiff was contacted by Grant Tyler in Human Resources.

68. However, instead of addressing the pervasive harassment she encountered from Engelbert (and no action by her immediate supervisors to remediate the situation), Tyler focused on the altercation that Engelbert had provoked with Plaintiff's boyfriend.

69. Plaintiff fully informed Grant Tyler regarding the harassment and related issues regarding Engelbert.

70. Tyler advised Plaintiff that she should report any further incidents, but Tyler did not state whether anything would be done to address Engelbert's harassment of Plaintiff.

71. Before her shift ended that date, Plaintiff was approached by Plant Manager Andrew Shipley and Shipley's boss, Kevin Kelsey.

72. Shipley and Kelsey advised Plaintiff that her boyfriend would no longer be permitted on Pepsi's property.

73. Plaintiff advised Shipley and Kelsey that she and her boyfriend had already made alternative arrangements that would negate the need for the boyfriend from entering Pepsi's property to pick Plaintiff up.

74. However, neither Shipley nor Kelsey addressed one incident or issue regarding Engelbert's harassment of Plaintiff.

75. On or about May 2016 (within weeks of Plaintiff addressing her Engelbert complaints with plant management and Human Resources), Plaintiff opted not to attend an "employee appreciation dinner."

76. Instead, Plaintiff ate her lunch in the break room by herself.

77. Plaintiff was never told that attendance at the "employee appreciation dinner" was mandatory.

78. Approximately one week after the "employee appreciation dinner," Plaintiff was placed on suspension, by Plant Manager Andrew Shipley and another member of the management team, for failing to attend the "employee appreciation dinner" and not clocking out for that time period.

79. Plaintiff noted to Shipley and the other manager that employees at the facility had not previously been required to clock out for such gatherings, and further, no one else had been required to clock out.

80. On or about June 3, 2016, Plaintiff was notified in a text message from Andrew Shipley that her employment at Pepsi had been terminated.

81. The reason given for her termination: "Time theft" (for failing to clock out for the "employee appreciation dinner").

82. Plaintiff's suspension and termination occurred within weeks of her April 2016 meetings with Plant Manager Andrew Shipley and Grant Tyler from Human Resources, in which she complained about the pervasive harassment to which she was subjected by her co-worker, Engelbert.

83. On or about September 29, 2016, Plaintiff, by and through counsel, submitted a Uniform Intake Questionnaire to the Equal Employment Opportunity Commission ("EEOC"), complaining of sexual harassment and retaliation.

84. On or about November 29, 2017, the EEOC issued a "Dismissal and Notice of Rights," or "Right to Sue Letter," regarding Plaintiff's matter.

85. Said "Right to Sue Letter" was received at the office of Plaintiff's counsel on December 1, 2017.

86. Consequently, this Complaint is being filed within ninety (90) days of receipt of the "Right to Sue Letter," in conformity with the applicable statute.

**FIRST CAUSE OF ACTION**
**UNLAWFUL DISCRIMINATION / HOSTILE WORK ENVIRONMENT**
**TITLE VII, 42 U.S.C. §§ 2000e *et seq.***
**AS TO DEFENDANT PEPSI**

87. Plaintiff Erica D. Martinez incorporates paragraphs 1 through 86 herein as if fully set forth verbatim.

88. Plaintiff was an employee of Defendant Pepsi.

89. Plaintiff was subjected to repeated instances of unwelcome and offensive conduct and commentary in her workplace by a male co-worker.

90. The instances of unwelcome and offensive conduct were directed at Plaintiff on the basis of her sex, female.

91. The unwelcome and offensive commentary and conduct created a hostile work environment for Plaintiff.

92. Plaintiff perceived her workplace to be hostile on the basis of the unwelcome and offensive commentary and conduct by her male co-worker.

93. Plaintiff complained repeatedly to employees of Pepsi that were in her supervisory chain, up to and including the Plant Manager and Human Resources.

94. In response, Defendant Pepsi did nothing to bring the harassment by the male co-worker to cessation.

95. As a result of the actions constituting a hostile work environment because of Plaintiff's sex, Plaintiff's rights were violated, causing her injury.

**SECOND CAUSE OF ACTION**
UNLAWFUL DISCRIMINATION / RETALIATION
TITLE VII, 42 U.S.C. §§ 2000e *et seq.*
AS TO DEFENDANT PEPSI

96. Plaintiff Erica D. Martinez incorporates paragraphs 1 through 95 herein as if fully set forth verbatim.

97. Plaintiff was an employee of Defendant Pepsi.

98. Plaintiff was subjected to repeated instances of unwelcome and offensive conduct and commentary in her workplace by a male co-worker.

99. The instances of unwelcome and offensive conduct were directed at Plaintiff on the basis of her sex, female.

100. The unwelcome and offensive commentary and conduct created a hostile work environment for Plaintiff.

101. Plaintiff complained repeatedly to employees of Pepsi that were in her supervisory chain, up to and including the Plant Manager and Human Resources.

102. In response, Defendant Pepsi subjected Plaintiff to adverse employment actions, specifically, suspension and discharge.

103. As a result of the actions constituting retaliation, Plaintiff's rights were violated, causing her injury.

**PUNITIVE AND EXEMPLARY DAMAGES**

104. Plaintiff Erica D. Martinez incorporates paragraphs 1 through 103 herein as if fully set forth verbatim.

105. The acts and omissions by Defendant Pepsi, as set forth in the preceding paragraphs, demonstrate that Defendant was engaged in conduct evincing malice or reckless indifference to Plaintiff's rights.

106. As a direct result of Defendant Pepsi's malice and /or reckless disregard for Plaintiff's rights, Plaintiff is entitled to exemplary and punitive damages in an amount to be determined by a jury commensurate with the financial resources available to Defendant and sufficient to deter others similarly situated from like behavior, subject to applicable statutory caps.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Erica D. Martinez prays this Court will grant to her the following relief:

A. Judgment against Defendant Pepsi in excess of Seventy-Five Thousand Dollars ($75,000.00);

B. Punitive damages against Defendant Pepsi where permitted by law;

C. Order Defendant Pepsi to pay the attorney fees, costs, and accruing interest incurred by Plaintiff in prosecuting this matter;

D. Any other such further relief this Court deems just and proper.

Respectfully submitted,

**MCMURRAY || KEESLING**

/s/ David R. Keesling
David R. Keesling, OBA No. 17881
Timothy S. Kittle, OBA No. 21979
6660 South Sheridan Road, Suite 250
Tulsa, Oklahoma 74137
(918) 998-9350 – Telephone
(918) 998-9360 – Facsimile
David@KLGattorneys.com
Tim@KLGattorneys.com
*Attorneys for Plaintiff:*
*Erica D. Martinez*